OPINION

This is an appeal from a decision of the Office of Hearings and Appeals (OHA) to invalidate unofficial general election results for the Birdsprings and Tolani Lake chapters, and order a special election. The OHA’s decision is affirmed in part and reversed in part.
I
PROCEDURAL HISTORY
A general election was held on November 2, 2010. Chee (Appellee), the incumbent, was a candidate for Council Delegate for the newly-apportioned precinct of Birdsprings, Cameron, Coalmine Canyon, Leupp, and Tolani Lake chapters. Chee lost the election to his challenger, Walter Phelps, by 31 votes according to the unofficial results for the entire precinct. On November 12, 2010, Chee filed a Statement of Grievance (Statement) with an attached petition in the OHA against the Navajo Election Administration (NEA) and Navajo Board of Election Supervisors (NBOES) *372 to dispute the outcome of the election. Chee listed the following grievances in his Statement: 1) ballot shortage in Birdspr-ings; 2) ballot shortage in Tolani Lake; 3) unqualified poll officials in Birdsprings; 4) insufficient control of polling area in Birdsprings; and 5) improper literature distribution within restricted area in Tola-ni Lake; and 6) improper voting past time for closing the polls in Birdsprings. Statement of Grievance (November 2, 2010).
Pursuant to 11 N.N.C. § 341(A)(1), the OHA found the grievances in the Statement and its attached petition sufficient and proceeded to a hearing, which was held on November 22, 2010 with both parties appearing with legal counsel. At the conclusion of the hearing, the Hearing Officer asked the parties to file proposed final judgments by November 29, 2010. On December 1, 2010, the OHA issued a decision invalidating the general election results for the Birdsprings and Tolani Lake chapters.
On December 7, 2010, Appellants NEA and NBOES filed a Notice of Appeal. The Court issued an order setting an expedited briefing schedule. Briefs by the parties were timely filed. A motion for leave to file an amicus curiae brief was filed by Walter Phelps. The Court granted Mr. Phelps’ motion and accepted his amicus brief for consideration. The Court now issues its decision.
II
ISSUES
The issues are (1) whether the OHA properly determined that Chee’s Statement of Grievance was sufficient, on its face, under the Election Code; and (2) whether the decision of the OHA to invalidate the 2010 general election results at Birdsprings and Tolani Lake chapters is sustained by sufficient evidence on the record.
Ill
STANDARD OF REVIEW
The scope of review of the decision of the OHA is limited to whether the OHA’s decision is sustained by sufficient evidence on the record. 11 N.N.C. § 408(F) and § 341(A). The Court will review the sufficiency of the Statement of Grievance under an abuse of discretion standard. Pioche v. Navajo Board of Election Supervisors, 6 Nav. R. 360, 364 (Nav.Sup.Ct.1991). The Court will review the decision of the OHA under a sufficiency of the evidence standard. 11 N.N.C. § 341(A)(4).
In addition, the below applies in our review of election matters.
Because an election dispute has the potential of not only denying rights to political candidates but to their constituent, there is a strong presumption that elections are conducted in conformance with the law and therefore are presumed valid. See Johnson v. June, 4 Nav. R. 79, 79-82 (Nav.Ct.App.1983) (outlining election principles). Therefore, the burden is on the grievant to overcome the presumption of a proper and valid election. In Morris v. Navajo Board of Election, Supervisors, 7 Nav. R. 75 (Nav.Sup.Ct.1993), the Court delineated the two-step test required to be used in a challenge of an election after the election has been conducted. In step one, the aggrieved party must prove the allegations contained in the statement of dispute by clear and convincing evidence; in step two, the aggrieved party must overcome the Johnson presumption of a valid and proper election. Id. at 77.
Clear and Convincing. Appellants assert that there is no election dispute case specifically explaining the clear and con *373 vincing standard. However, we have the legal definition of “dear and convincing evidence” as “[e jvidence indicating that the thing to be proved is highly probable or reasonably certain.” Black's Law Dictionary 636 (9th ed,2009). This standard is higher than the preponderance of the evidence standard which applies to most civil trials, but less than evidence beyond a reasonable doubt, the standard for criminal trials. Id. Additionally, Navajo Nation v. Crocket, 7 Nav. R. 237 (Nav.Sup.Ct. 1996), essentially uses the clear and convincing standard in the damages phase of a civil suit by requiring the plaintiff to prove his/her damages with “reasonable certainty” and with the “best available evidence.” Because of the presumption that elections conducted are regular and proper, the clear and convincing standard must be strictly enforced. The standard in Crock-et, supra, is adopted herein. Crocket’s requirement for “best available evidence” under this standard shall be applied in accordance with the OHA’s hearing rules, which permit liberality in the admission of evidence, but forbids the admission of “untrustworthy” evidence and requires sworn statements of all witnesses subject to cross-examination. Rules for Administrative Hearings Under the Election Code, Office of Hearings and Appeals, Rule 4(B) and (C) and Rules 8,12 and 13.
Actual Impact on Election Outcome. It is a settled doctrine of Navajo Nation election law that once an allegation has been proven true, the aggrieved party must overcome the presumption of a valid and proper election. Specifically, “the one contesting the election must then show by sufficient evidence that the misconduct or irregularity actually changed the result of the election or prevented a fair election,.” The Navajo Election Commission v. Lancer, 5 Nav. R. 59, 60 (Nav. Ct.App.1985) (emphasis added) citing Williams v. Navajo Election Commission, 5 Nav. R. 25 (Nav.Ct.App.1985), Johnson v. June, 4 Nav. R. 79 (Nav.Ct.App.1983). The grievant is required to prove that the outcome of the election was affected and that the election results would have been different but for the error. Williams, Fulton, Morris and Lancer, supra. Speculation is not enough to overturn the results of an election. Johnson, 4 Nav. R. 79, 80.
IV
SUFFICIENCY
Upon a filing of the Statement of Grievance, the OHA has a statutory duty to either 1) dismiss the grievance, if, on its face, the Statement is insufficient, or to 2) schedule a hearing on the allegations. See 11 N.N.C. § 341(A). The preliminary review for sufficiency is confined to the allegations made by the grievant in the Statement. Secatero v. Navajo Board of Election Supervisors, 6 Nav. R. 385, 389 (Nav.Sup.Ct.1991). Furthermore,
A Statement [of Grievance] will be sufficient on its face if it specifies which election law was violated, and if it contains enough facts to raise the issue that the election results were not regular and proper. These facts, as they appear in the Statement, must support the allegation that an election law was violated. Finally, the Statement taken as a whole, which shall include all attached documents, must raise a possibility that the election results will be impeached.
Secatero at 388, citing Brown v. Navajo Board of Election Supervisors, 5 Nav. R. 139, 140 (Nav.Sup.Ct.1987) (citations omitted). The only purpose of face review is to determine if the Statement contains sufficient facts to raise an issue which would require a hearing. Brown at 140. The facts alleged in the Statement must raise *374 issues about the regularity and appropriateness of an election and need not prove the claims. Brown v. NBOES, 5 Nav. R. 139 (Nav.Sup.Ct.1988) at 140. The OHA has considerable discretion in determining whether the Statement is sufficient on its face. Absent a clear abuse of that discretion, the Court will not disturb the OHA’s decision. See id.
Chee listed six grievances in his Statement, and specified the election law or regulation allegedly violated while setting forth the reasons why he believed that the Election Code had not been complied with. Pursuant to 11 N.N.C. § 841(A)(2), the OHA was justified in its decision to schedule a hearing to determine if Chee’s allegations in the Statement were true and supported by the law. We conclude that the OHA acted within its discretion in determining that Chee’s Statement of Grievance with an accompanying petition is sufficient, on its face, and required further proceedings. The decision of the OHA on face review is affirmed.
V
TOLANI LAKE
The OHA found that there was a ballot shortage at Tolani Lake from “during the afternoon” to “well after 7 p.m.,” thereby suggesting that time of the ballot shortage was lengthy and impacted numerous potential voters. The OHA further found that some individuals were turned away and unable to vote, that no list was maintained of voters who arrived during the ballot shortage, that no police officers were present, and that the restrooms were open to the public in violation of the election handbook. The OHA then invalidated the Tolani Lake election results. We conclude that the OHA erred for the below reasons.
The audio recording of the hearing on November 22, 2010 show that it is undisputed that the ballot shortage at To-lani Lake occurred almost as the polls were about to close and lasted no more than 15 minutes until the polls closed. The ballot shortage occurred at approximately 6:45 p.m., and while ballots were being obtained, polling officials at Tolani Lake were instructed to keep those individuals who arrived before 7 p.m. in the chapter house until more ballots arrived. Testimony of Sally Tohani, Voter Registration Specialist, Tolani Lake Chapter, Audiotape of Hearing, November 2, 2010. All of the 10-15 individuals who appeared within the 15-minute period until the polls closed at 7:00 p.m. stayed to vote when ballots arrived sometime after 7 p.m. Id. There is no dispute that all these individuals voted.
It is Chee’s burden both to rebut the presumption of a valid and proper election by clear and convincing evidence, and to show that any proven irregularities had actual impact on the election results. We find that no voter was unable to vote due to the ballot shortage or was otherwise turned away from Tolani Lake. Furthermore, there is no evidence that the non-maintenance of a list of persons who came to the polling place to vote during the fifteen-minute ballot shortage period at Tolani Lake caused any voter to be turned away or leave the polling place prior to casting a vote. Finally, there is no evidence whatsoever that the public access to the restroom at the Tolani Lake chapter house prejudiced the election results in any way, nor is there evidence that the absence of police officers at the polling place substantially impacted the brief fifteen-minute ballot shortage or otherwise prejudiced the election results.
On the basis of the foregoing, we find that the clear and convincing standard was clearly not met, and there is no basis for *375 the OHA to invalidate the election results in Tolani Lake Chapter. The OHA erred.
VI
BIRDSPRINGS
The OHA found that there was a ballot shortage at Birdsprings from 3:30 pm to 6:50 pm and that some individuals were turned away and unable to vote. The OHA further found that no police officers were present, and that 6 voters voted on November 4, 2010, two days after the day of the general election. The OHA then invalidated both the Birdsprings election results and also the 6 votes cast on November 4, 2010. We conclude that the OHA erred for the below reasons.
The audio recording of the hearing and the parties’ briefs show that OHA erred in its finding of the length of time of the Birdsprings ballot shortage. The record shows that 40 ballots remained at 3:30 p.m. on general election day, and more ballots were requested to be delivered at that time. The polling site ran out of ballots at 4:30 p.m. Testimony of Nathaniel Many-goats, Chief Poll Judge, Birdsprings Chapter, Audiotape of Hearing, November 2, 2010. The record will be clarified to show a two-hour ballot shortage, not three.
Conflicting evidence was presented to the OHA regarding individuals who were turned away and unable to vote during the ballot shortage. According to Manygoats’ sworn live testimony, at the direction of the Tuba City office, local poll officials instructed individuals who arrived after the ballot shortage to remain in the chapter house and sign in. Manygoats testified that all individuals who presented themselves to vote at the polling place were placed on this list and no one was turned away. 80 names were listed in the ensuing two hours, indicating an average of 40 voters per hour since a reliable tally commenced to be kept at 3:30 p.m. 10 individuals on the list were unable to stay until the ballots arrived, and left. Id. At 6:50 p.m., more ballots were delivered and the remaining 70 listed individuals voted. Other individuals who arrived thereafter and before the polls closed ten minutes later at 7:00 p.m. were allowed to vote without having to sign in. Id.
In rebuttal, Chee presented unsworn and unattested letters from 3 individuals claiming that they were turned away without being placed on any list at Birdsprings. However, none of the individuals who submitted the letters appeared to testify under oath at the November 22, 2010 hearing to be cross-examined, nor were their letters sworn or attested. The letters do not identify whether they entered the polling place itself, whether they were told of the ballot shortage outside the polling place, and whether they spoke with other individuals waiting for ballots to arrive or with official poll workers. As the individuals were not present to be questioned, their unattested letters raise more questions as to the circumstances of their non-vote than provide dear and convincing evidence that these individuals were, in actual fact, turned away from Birdsprings by official poll workers and otherwise not placed on the list after duly presenting themselves to polling officials. Additionally, two of the three individuals who alleged they were denied an opportunity to vote, were actually not registered voters. Testimony of Sally Tohani, supra.
For the “dear and convincing” standard to be met, facts must be established with reasonable certainty. See'Standard of Review section, supra. Here, vre have conflicting testimony, on the one hand specific and sworn live testimony available for cross-examination; on the other unsworn and unattested letters from individuals who did not present themselves for testi *376 mony under oath and which lack important specific detail as to who they spoke with or even whether they entered the Birdsprings polling place to be properly listed. Additionally, the relationship of the unattested letter writers with either Chee or Chee’s challenger would have been a relevant question under cross-examination, which could not take place due to their absence from the hearing without explanation. Under these circumstances, a finding that any individuals were left off the list or were turned away can by no means be made with “reasonable certainty.” Based on the foregoing, there is no evidence established by clear and convincing evidence that anyone wishing to vote at Birdsprings was turned away or unable to vote; or that individuals presenting themselves at Birdsprings were turned away or otherwise not placed on the list of those who presented themselves to vote during the Si-hour long ballot shortage.
Again, it is Chee’s burden both to rebut the presumption of a valid and proper election by clear and convincing evidence, and to show that any proven irregularities had actual impact on the election results. We find that Chee failed to establish with reasonable certainty that any voter was unable to vote due to the ballot shortage or was otherwise turned away from Birdsprings. Furthermore, there is no evidence established with reasonable certainty that any voter presenting himself or herself to vote during the ballot shortage period was not placed on the sign-in list. Additionally, while the OHA’s decision found that police officers normally gave assistance to poll workers during ballot shortages, 11 N.N.C. § 81(F) places no duty on police officers to take on the responsibility of running ballots during shortages. There is no basis to conclude that the absence of police impacted the ballot shortage at Birdsprings.
Finally, we note that 10 individuals who were on the ballot shortage list left before the ballots arrived and did not vote on election day. Testimony of Nathaniel Manygoats, supra. It is undisputed that Birdsprings polling officials later contacted the 10 individuals who did not vote and arranged for them to vote on November 4, 2010, at which time 6 of the 10 voted, leaving 4 individuals who did not vote at Birdsprings because of the ballot shortage. Id. OHA invalidated these votes on the basis of 11 N.N.C. § 3 and § 82.[1] Findings of Fact and Conclusions of Law at 5. However, Chee having lost by 31 votes, the 6 invalidated votes plus the remaining 4 voters impacted by the ballot shortage who did not vote are not numerically significant to impact the election results. Therefore, this Court need not address the merits of the OHA’s decision on this issue.
On the basis of the foregoing, Chee has not met either burden under Johnson. Amicus Phelps asserts that, at best, Appel-lee’s evidence is speculation amounting to gi’it% sha’shin, daats’7, complying with no legal standard of proof. We agree. We find that the clear and convincing standard was clearly not met, and there is no basis for the OHA to invalidate the election results in Birdsprings Chapter. The OHA erred.
VII
FREE AND INTELLIGENT VOTE
In its decision, the OHA suggested that a ballot shortage that causes voters to be turned away or otherwise be unable to *377 vote constituted an “obstruction of a free and intelligent vote” pursuant to Johnson, supra at 81. We clarify that “free and intelligent vote” is not appropriately used in the context of ballot shortages or other circumstances impacting the physical exercise of the voting right.
“Free and intelligent vote” is hereby clarified as follows: by “free,” a voter votes pursuant to his or her conscience, unrestrained, unburdened and unforced by outside pressure. By “intelligent,” a voter casts an informed vote with a good understanding of the matter voted on.
VIII
CONCLUSION
The OHA’s determination of sufficiency is AFFIRMED.
The OHA’s decision to invalidate the general election results in Birdsprings and Tolani Lake is REVERSED. The elections in the Birdsprings and Tolani Lake chapters are declared VALID. The NEA is hereby ORDERED to immediately certify the 2010 general election results for the Birdsprings and Tolani Lake chapters.

. We note that Section 3 sets the schedule for election dates, and Section 82 requires that “[a]U voters present at the polling place and in line to vote at 7:00 p.m. will be allowed to vote.”